SABAH SHIPYARD SDN.
BHD., Plaintiff,

v.

M/V HARBEL TAPPER, in rem; L & C
III, Ltd.; Industrial Maritime Carriers
(Bahamas), Inc.; Rohde & Liesenfeld,
Inc.; Rohde & Liesenfeld Pte., Ltd.;
Rohde & Liesenfeld Sdn. Bhd.; Wind-
rose Line; Intermarine Incorporated;
Progressive Assurance Sdn. Bhd; and
Malaysian Assurance Alliance Bhd., De-
fendants.

No. CIV. A. G–95–046.

United States District Court,
S.D. Texas,
Galveston Division.

Oct. 31, 1997.

William Carl Bullard, Mark L. Walters, Baker and Botts, Houston, TX, Alfred E. Yudes, Jr., Watson Farley & Williams, New York City, for Plaintiff.

Kevin Patrick Walters, Dimitri P. Georgantas, Georgantas and Walters, Houston, TX, for Defendant L&C III Ltd.

Machale A. Miller, Michael D. Sledge, O'Neil Eichin Miller and Breckenridge, New Orleans, LA, for Defendants Indus. Maritime Carriers (Bahamas) Inc., Intermarine Inc.

William A. Durham, Eastham Watson et al., Houston, TX, Ted C. Litton, Royston Rayzor Vickery and Williams, Houston, TX, James Richard Watkins, Royston Rayzor et al., Galveston, TX, for Windrose Line.

James Richard Watkins, Gus A. Schill, Jr., Royston Rayzor et al., Galveston, TX, for Rohde & Liesenfeld Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENT, District Judge.

This cause was tried before the Honorable Samuel B. Kent, judge presiding, without benefit of a jury, pursuant to F.R.C.P. Rule 9(h), during August 25–27, 1997. Having considered all testimony and evidence therein presented, as well as voluminous post-trial submissions, and based upon a preponderance of the evidence, the Court hereby enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

#### I. PARTIES.

1. Plaintiff Sabah Shipyard Sdn. Bhd. ("Sabah") is a shipyard located in Labuan, Malaysia. In 1993, Sabah purchased a W501D5 econopac, an electrical power generating plant, from Westinghouse Electrical Corporation (Trial Exhibit 20) to be used on a barge-mounted power generating plant to produce and sell electricity to the National Power Corporation of the Philippines ("Napocor"). (Trial Exhibit 19). Sabah had to give Napocor various performance guarantees including the "heat rate," i.e., amount of fuel consumed for a given electrical output. The engine portion of the power generating plant was a W501D5 gas turbine. (Trial Exhibit 20).

2. Defendant Intermarine Inc. ("Intermarine"), located in New Orleans, Louisiana, was the agent for Defendant Industrial Maritime Carriers (Bahamas), Inc. ("IMB"), the successful bidder for the business of transporting approximately 135 pieces of Westinghouse equipment, including the W501D5 gas turbine, from Houston, Texas to Sabah's facilities in Labuan. (Trial Exhibit 2). IMB was informed that the Napocor project was a "fast track" project and that time was of the essence in delivery of the Westinghouse equipment.

3. L & C III, Ltd. was at all relevant times the owner of M/V HARBEL TAPPER. IMB was the time charterer of the HARBEL TAPPER. (Trial Exhibit 39).

4. On or about December 16–17, 1993, Sabah's Westinghouse equipment was loaded on HARBEL TAPPER in Houston, Texas. (Trial Exhibits 210 and 356). Sabah was not informed of the possibility of transshipment from the HARBEL TAPPER at the time the vessel loaded. (Trial Exhibit 38). The vessel sailed from Houston on or about December 18, 1993. (Trial Exhibits 210 and 356).

#### II. AGREEMENTS.

5. The agreement Sabah signed in regard to the transportation of the Westinghouse equipment was a CONLINE booking note dated December 10, 1993 with Sabah's forwarding agent, Rohde & Liesenfeld Pte. Ltd., through its unincorporated division, Windrose Line, for carriage onboard M/V SIMON BOLIVAR or substitute from Houston, Texas to "Sabah Shipyard Labuan (via Singapore)." (Trial Exhibit 1).

6. IMB executed a similar booking note with Windrose Line which was not copied to Sabah. (Trial Exhibit 2). The IMB CONLINE booking note with Windrose Line contained the express clause that, "when the ultimate destination at which the Carrier may have engaged to deliver the goods is other than the vessel's port of discharge the

Carrier acts as Forwarding Agent only." (CONLINE booking note Clause 6; see Trial Exhibits 1 and 10 for full text of CONLINE clauses).

7. No bill of lading was ever issued to Sabah concerning the shipment from Houston to Labuan, or any part of that shipment, and IMB acknowledges that it authorized delivery of the cargo in Labuan and in Singapore without production of an original bill of lading. (Trial Exhibit 332).

8. IMB caused a bill of lading dated December 18, 1993 to be issued for cargo loaded onboard HARBEL TAPPER. (Trial Exhibit 10). This bill of lading was signed on behalf of the Master and specified port of loading Houston, port of discharge Singapore and "place of delivery by oncarrier Labuan," and covered 135 packages, including the gas turbine and related equipment at issue in this litigation. This bill of lading also contains CONLINE Clause 6 as quoted above. This bill of lading was never provided to Sabah. This bill of lading was issued to Rohde & Liesenfeld on January 31, 1994. (Trial Exhibits 10 and 219).

9. Windrose Line also prepared a bill of lading for carriage on board HARBEL TAPPER from Houston with port of discharge Singapore and place of delivery by oncarrier Labuan for the same 135 pieces of Westinghouse equipment, including the gas turbine and related equipment. (Trial Exhibit 11). This bill of lading was never issued to Sabah.

10. IMB additionally prepared and forwarded to its agents in Singapore and Malaysia two other bills of lading, one showing carriage from Houston to Labuan of four packages, the gas turbine and three packages of related equipment, that were off-loaded in Singapore (Trial Exhibit 4), and another showing 135 pieces of Westinghouse equipment to be carried on HARBEL TAPPER from the port of loading Houston to port of discharge Labuan. (Trial Exhibit 5). Neither of these bills of lading mentioned discharge in Singapore, or oncarriage to Labuan. Again, Sabah was never provided with copies of either of these bills of lading.

11. HARBEL TAPPER was not the first vessel designated to carry the Westinghouse equipment from Houston to Labuan. First, on or about December 2, 1993, IMB proposed carriage onboard VAST JOLLITY, and Sabah acknowledged confirmation of this booking with Rohde & Liesenfeld on or about December 3, 1993. (Trial Exhibit 28). When this proposal was made, it was not indicated that there would be any transshipment from VAST JOLLITY. However, on or about December 6, 1993, allegedly due to the draft of the VAST JOLLITY and draft restrictions at Sabah's pier in Labuan, Sabah was informed it might be necessary to transship the cargo from VAST JOLLITY. (Trial Exhibit 32).

12. On or about December 7, 1993, IMB substituted SIMON BOLIVAR for VAST JOLLITY, which was unavailable on the dates for loading the cargo. At this time, it was not indicated that there would be any need to transship from the SIMON BOLIVAR. (Trial Exhibit 33). Subsequently, on or about December 9, 1993, Intermarine informed Rohde & Liesenfeld that it reserved the right to transship the cargo from the SIMON BOLIVAR. (Trial Exhibit 35).

13. On or about December 13, 1993, Sabah signed the booking note with Rohde & Liesenfeld's division, Windrose Line, for carriage on SIMON BOLIVAR (Trial Exhibit 1).

14. On or about December 16, 1993, IMB substituted HARBEL TAPPER for the SIMON BOLIVAR and began loading that day in Houston, Texas. (Trial Exhibit 37). Sabah did not learn of the substitution until December 17, after the vessel had commenced loading. (Trial Exhibit 38). HARBEL TAPPER, which was owned by L & C III Ltd. and chartered by IMB (Trial Exhibit 39), sailed from Houston on December 18, 1993. (Trial Exhibit 356). At the time the vessel departed Houston, Sabah was not informed of any need to transship from HARBEL TAPPER nor that its Westinghouse equipment would be offloaded onto a barge in Singapore.

15. On or about January 20, 1994, Sabah was informed that the vessel would first call in Singapore to transship cargo, but was not told how much cargo would be transshipped in Singapore and was never told before the

casualty at issue herein that the cargo would be offloaded to a barge. (Trial Exhibit 45).

16. IMB unilaterally made the decision to offload four "heavy lift" pieces of Westinghouse equipment in Singapore and to transship these to Labuan. IMB first planned to use its own vessel, the ASTRALIFT, to transship the heavy lift pieces, but upon learning that this vessel would be delayed in drydock, made the decision to transship the heavy lift equipment on an unrelated vessel, M/V GRIETJE. (Trial Exhibit 48).

## III. *INTERRUPTION OF THE VOYAGE IN SINGAPORE.*

17. Prior to HARBEL TAPPER's arrival in Singapore, IMB realized that it could not use the ASTRALIFT and made arrangements for the carriage of the heavy lift pieces, including the gas turbine, on board M/V GRIETJE. IMB's agent in Singapore, Hiap Woon Pte. Ltd. ("Hiap Woon"), reported to IMB that the cargo could be discharged to either the wharf or a barge to await transshipment. (Trial Exhibits 52 and 53). If there were a short delay in Singapore, storage charges for barge discharge would be less than if the cargo were discharged to a wharf. (Trial Exhibit 55). IMB instructed its agent Hiap Woon to discharge to a barge, and gave the agent the responsibility to obtain a suitable barge. *Id.*

18. Hiap Woon obtained a quote from a barge supplier who quoted providing a 120-foot "SC" barge at $800.00 per day. (Trial Exhibit 49). An "SC" designation in Singapore indicated that the barge was licensed to carry cargo. (Trial Exhibits 80, 81 and 82). However, on February 1, 1994, when HARBEL TAPPER arrived in Singapore, Hiap Woon instead accepted a smaller 100 foot (30 meter) barge, the ASIA MARINER 5, which was an "SR" barge. (Trial Exhibit 148, pp. 75, 99–100). An "SR" barge is not licensed by Singapore authorities to carry cargo. (Trial Exhibits 80, 81 and 82).

19. On February 1, 1994, HARBEL TAPPER arrived in Singapore (Trial Exhibit 356) and discharged the four pieces of heavy lift cargo to ASIA MARINER 5, which was then towed to Tuas Basin in Singapore. It is not disputed that the barge was never surveyed for suitability for storage for this or any other cargo; no on-hire survey on the barge was performed. (Trial Exhibit 81). The turbine weighing 150 tons and three other heavy lift cases of Westinghouse equipment were off loaded from HARBEL TAPPER onto the barge ASIA MARINER 5. The photographs of the discharge demonstrate the cargo barely fit on the deck of the barge, which was clearly inadequate and unseaworthy. (Trial Exhibits 57–61). ASIA MARINER 5 was much less expensive than the 120–foot barge, and IMB was charged only $300 a day. (Trial Exhibit 68). The barge ASIA MARINER 5 was unseaworthy at the time the cargo was discharged to the barge, as determined by three surveyors in Singapore and by defendant IMB's expert in this litigation. (Trial Exhibits 80, 81, 82 and 155).

20. The barge was unseaworthy in that: (1) the barge was not licensed to carry cargo; (2) the barge was in an extremely poor condition, and (3) the barge was too small for the Westinghouse equipment loaded on board. (Trial Exhibits 80, 81 and 82). Additionally, at the trial counsel for Intermarine and IMB conceded the barge ASIA MARINER 5 was unseaworthy.

21. No watchmen or guards were posted on the barge. (Trial Exhibit 81). On the morning of February 2, 1994, it was discovered that during the night the barge had taken on water, developed a list, and the turbine and two of the three cases of equipment slid off the barge into Singapore harbor and settled on the seabed in salt water ten meters deep. *Id.* As the gas turbine slid off the ASIA MARINER 5, it struck the side of the barge moored next to ASIA MARINER 5 and holed it. (Trial Exhibits 80, 81 and 82). Although salvage operations commenced on February 2, 1994, the turbine was not removed from the water until February 6, 1994. *Id.* The turbine could not be lifted from the seabed by all four of its manufacturer-recommended lifting points, but was instead lifted vertically by two of the lifting points. *Id.* The method of lifting the turbine likely caused internal damage to the turbine. (Trial Exhibit 79, p. 3).

22. After the turbine was removed from the water, it was washed down with salt water, followed by a fresh water wash at the yard of the salvor, Semco. The turbine was then stored at the Semco yard until it was auctioned in December, 1994.

## IV. POST CASUALTY.

23. Shortly after the casualty, IMB informed Sabah that it acted as Forwarding Agent, not as a carrier, in regard to the transshipment of the heavy lift equipment in Singapore (Trial Exhibit 84).

24. Immediately after the casualty, Sabah contacted Westinghouse and shortly thereafter an independent turbine expert, William McCall, to determine what should be done with the damaged gas turbine. Both Westinghouse and Mr. McCall stated that the turbine could not be repaired. (Trial Exhibits 71, 73, 74, 76 and 78). Both advised Sabah that irreversible damage had been incurred by the turbine, repairs could not be economically effected and there was nothing that Sabah could do to ameliorate the effects of the mechanical damage to the turbine and its immersion in salt water. (Trial Exhibits 76 and 78). As stressed by both Westinghouse and Mr. McCall, operating the unit after it had been exposed to such a hazardous environment would be risky and possibly life-threatening. *Id.* However, the turbine was not promptly disassembled and the Court finds that aggressive cleaning, inspection, preservation and parts marketing would have much more substantially mitigated Plaintiff's loss. (Slater trial testimony).

25. Westinghouse informed Sabah that there were no facilities in Singapore, nor for that matter anywhere other than the Westinghouse facilities in Houston, that had the equipment and expertise necessary to disassemble and inspect the turbine thoroughly. (Trial Exhibit 74). The Court finds this unpersuasive. If immersed in fresh water with an elevated pH, corrosion would have been arrested. This would have bought time for much more comprehensive cleaning, inspection and repairs. This could have been done in facilities available in Singapore. (Slater trial testimony).

26. Shortly after the casualty, John Cummings of Sabah contacted Mike Craigie at Van Der Horst in Singapore concerning repair of the turbine. Craigie informed Cummings that the facilities needed for the repair of the turbine were not available in Singapore. (Cummings Trial Testimony) Again, the Court disagrees.

27. Westinghouse would not warrant the condition or performance of the turbine if it were refurbished. (Trial Exhibit 76). Therefore, the Court finds replacement, rather than repair, was economically justified.

28. In March 1994, Westinghouse estimated the value of the salvageable parts of the turbine at US$1.5 million. Mr. McCall estimated the value of salvageable parts of the turbine and related equipment at US$2 million. Mr. McCall's estimates were based upon contemporaneous sales he had made of similar used parts for a W501B Westinghouse gas turbine, a sister to the W501D5 gas turbine at issue in this litigation. No other valuations were received by Sabah until the 1997 estimates by defendants' expert, Mr. Wilson, in this litigation. He opined values of up to US$9.9 million. The totality of the evidence supports the value of the salvageable parts at US$6 million, and the Court so finds.

29. The turbine was auctioned in Singapore in December 1994. (Trial Exhibit 153). The auction was well attended, with over twenty persons in the gas turbine industry present. (Trial Exhibit 153, p. 23, lines 3–5). Despite this attendance, the Sabah representative was the only bidder and took the turbine for $100,000.

30. In 1995, Westinghouse gave Sabah a $2 million credit on the purchase of a gas turbine from Westinghouse in return for Sabah surrendering the damaged turbine to Westinghouse. (Trial Exhibit 142, p. 17).

## V. DAMAGES.

31. Sabah's damages are as follows:

TURBINE REPLACEMENT COSTS

Cost of Replacement Turbine, mechanical package, pipe rack (less cost of naphtha fuel skid, start-up equipment, and fuel oil heat tracing) (Trial Exhibits 99–101)                    $13,090,245.00

| | |
|---|---|
| Shipping Replacement Turbine (Trial Exhibit 106) | 306,354.71 |
| Insurance for Shipment of Replacement Turbine (Trial Exhibit 106) | 42,800.14 |
| Case No 16—left in Singapore by IMB; one-half transport cost Singapore to Labuan (Trial Exhibits 111, 118 and 119) | 52,371.70 |
| Salvage Costs (Trial Exhibit 113) | 32,495.58 |
| Storage cost (until auction) (Singapore $90,214.00 at exchange rate of 1.513) | 59,625.90 |
| Auction costs and fees | 100,793.94 |
| Sub–Total | $13,684,686.97 |
| Less reasonable mitigation | ($6,000,000.00) |
| TOTAL | $ 7,684,686.97 |
| PLUS interest @ at 5.0% simple interest, per annum, 45 months from February 1, 1994 to Nov. 1, 1997 | 1,440,878.81 |
| GRAND TOTAL | $ 9,125,565.78 |

32. While IMB admits it knew the gas turbine and related Westinghouse equipment were needed for a "fast track" Sabah project in the Philippines, there is insufficient evidence in the Record to justify an assessment against IMB for the delay damages incurred by Sabah under the Philippine contract, as such did not foreseeably arise out of the loss of this cargo. The Court finds no damages for this alleged loss.

33. Bank charges incurred to purchase the replacement turbine were as follows (all numbers in U.S. dollars)

| | |
|---|---|
| 60 day interest | $ 96,272.50 |
| Bank acceptance charges | 22,131.61 |
| Transit charges (finance) | 33,622.08 |
| Advising/Negotiating bank charges | 20,347.46 |
| Letter of credit charges | 28,010.40 |
| Wing Tiek 2% finance charge | 280,265.51 |
| Total | $480,649.56 |

(Exhibit Nos. 102, 103, 104, 107, 108)

These financing charges were incurred because Sabah did not have sufficient funds to purchase a second turbine, the replacement turbine, and was forced to rely upon the credit of its materials supplier, Wing Tiek. However, there is no showing in the Record that such costs were foreseeable and the Court finds that 5.00% per annum simple interest, for past loss, is adequate compensation, as set out in Finding No. 31, supra.

34. Damages specified in Finding No. 31, supra, are jointly and severally assessed against Defendants IMB, Intermarine and the vessel owner L & C III, Ltd.

### CONCLUSIONS OF LAW

■ 1. Industrial Maritime Carriers (Bahamas) Inc. ("IMB") and Intermarine, Inc. ("Intermarine") are liable for the damages to the cargo at issue as freight forwarders or "forwarding agents" for negligence in that: (i) IMB and Intermarine stowed the cargo on an obviously unseaworthy barge; (ii) IMB and Intermarine took no measures to determine if the barge was seaworthy; (iii) IMB and Intermarine stowed the cargo on a barge that was too small for the cargo; and (iv) IMB and Intermarine stowed the cargo on a barge that was not licensed for the carriage of cargo.

■ 2. Freight forwarders may not limit their liability under COGSA, and may not take refuge in COGSA's $500 per package limit. *Hoffmann–LaRoche, Inc. v. M/V TFL JEFFERSON*, 731 F.Supp. 109, 110–11 (S.D.N.Y.1990) (COGSA, by its terms, is applicable only to carriers and not to freight forwarders).

■ 3. In the alternative, IMB and Intermarine, as well as L & C III, Ltd., are liable for damages to the cargo at issue as carriers under the Harter Act after the cargo was discharged from HARBEL TAPPER, awaiting transshipment for delivery to consignee Sabah in Labuan.

■ 4. The Harter Act applies to the carriage of cargo from a U.S. port to a foreign port (i) while the cargo is in the custody of the carrier and prior to loading on the vessel, and (ii) after the discharge of the cargo from the vessel and prior to the delivery of the cargo to the consignee. 46 U.S.C.App. §§ 190–196; 46 U.S.C.App. § 1311.

■ 5. Under the Harter Act, a carrier has an obligation to care for the cargo until it is delivered to the consignee. *Caterpillar Overseas, S.A. v. S.S. Expeditor*, 318 F.2d 720, 723 (2d Cir.), *cert. denied sub nom., American Export Lines, Inc. v. Caterpillar Overseas, S.a.*, 375 U.S. 942, 84 S.Ct. 347, 11 L.Ed.2d 272 (1963); *United States v. Ultramar Shipping Co.*, 685 F.Supp. 887, 896 (S.D.N.Y.1987), *aff'd*, 854 F.2d 1315 (2d Cir. 1988); *Central Trading Corp. v. M/V Dong Myung*, 361 F.Supp. 302, 304 (S.D.N.Y.1973).

6. There is no package limit under the Harter Act, and a carrier may not limit its liability under the Harter Act for damages caused by its breach of its duty to care for and properly deliver the cargo. 46 U.S.C.App. §§ 190–191; *Ultramar*, 685 F.Supp. at 896; *Morris v. American Shipping Co., Inc.*, 748 F.2d 563, 566–67 (11th Cir.1984).

7. L & C III, Ltd. is liable for the damage to the above cargo as carrier under the Harter Act. L & C III, Ltd. had an obligation to "carefully handle and stow her cargo and to care for and properly deliver same." 46 U.S.C.App. § 191. L & C failed to fulfill this obligation by discharging the cargo to an unsuitable and unseaworthy barge. *Ultramar*, 685 F.Supp. at 897. Under the Harter Act, a carrier may not limit its liability for damages caused by a breach of its duty to care for the cargo. *F.J. Walker Ltd. v. Motor Vessel Lemoncore*, 561 F.2d 1138, 1142–43 (5th Cir.1977); *Morris*, 748 F.2d at 566–67. Therefore, L & C may not claim the protection of any package limitation.

8. In the alternative, as carriers, IMB and Intermarine negligently discharged the cargo to the unseaworthy and unsuitable barge. The barge was unseaworthy at the time of the commencement of its voyage, and IMB and Intermarine failed to exercise due diligence to provide a seaworthy barge.

9. Even assuming COGSA applied, which the Court concludes to the contrary, a carrier may not limit its liability to the $500 COGSA package limitation where the carrier fails to exercise due diligence to provide a seaworthy vessel. *Walker v. Harris*, 335 F.2d 185, 197 (5th Cir.) *cert. denied*, 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1964); *Federazione Italiana Dei Corsorzi Agrari v. Mandask Compania De Vapores, S.A.*, 388 F.2d 434 (2nd Cir.), *cert. denied*, 393 U.S. 828, 89 S.Ct. 92, 21 L.Ed.2d 99 (1968).

10. The Court concludes that each and all of the Defendants, jointly and severally, are liable to Plaintiff in the amount of $7,684,-686.97, together with pre-Judgment interest of $1,440,878.81, for a total of $9,125,565.78, and Judgment is hereby rendered in like amount.

11. In the event any Finding of Fact constitutes a Conclusion of Law, it is adopted as such. In the event any Conclusion of Law constitutes a Finding of Fact, it is adopted as such.

**IT IS SO ORDERED.**

### *FINAL JUDGMENT*

This cause came on to be heard for trial before the Honorable Samuel B. Kent, judge presiding, without a jury, during a three-day trial, held August 25–August 27, 1997. Plaintiff Sabah shipyard Sdn. Bhd. appeared through its attorneys Watson, Farley and Williams and Baker & Botts, L.L.P., Defendant L & C III, Ltd. appeared through its attorneys Filteau, Sullivan and Georgantas, and Defendants Intermarine, Inc. and Industrial Maritime Carriers (Bahamas) Inc. appeared through their attorneys O'Neil, Eichin, Miller, Saporito & Harris. The parties thereafter timely filed numerous and extensive post-trial briefs, response briefs and reply briefs, and the issues having been duly tried, and the Court after considering all of the evidence and testimony, and after due deliberation having made and filed Findings of Fact and Conclusions of Law in writing on the 31st day of October, 1997, in favor of the Plaintiff, and jointly and severally against each and all of the Defendants, and directing the entry of Judgment thereon,

IT IS HEREBY ORDERED, ADJUDGED and DECREED that:

1. Defendants L & C III, Ltd., Industrial Maritime Carriers (Bahamas), Inc., and Intermarine, Inc. are jointly and severally liable in the amount of $7,684,686.97, together with pre-Judgment interest in the amount of $1,440,878.81, together totalling $9,125,-565.78, under the Harter Act for damages to the cargo of Plaintiff Sabah Shipyard Sdn. Bhd.;

2. Post–Judgment interest on the above amounts shall run from November 1, 1997 to the date of payment of such amounts and shall be computed at the rate of 6.00% per annum, simple interest. In the event said Judgment is not timely paid, let execution issue, as provided by law.

IT IS SO ORDERED. THIS IS A FINAL JUDGMENT. ALL RELIEF NOT HEREIN EXPRESSLY GRANTED IS DENIED.