**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 97-41417

_____

SABAH SHIPYARD SDN BHD,

          Plaintiff - Appellee-Cross-Appellant,

versus

M/V HARBEL TAPPER, IN REM; L & C III LTD;
INDUSTRIAL MARITIME CARRIERS (BAHAMAS), INC;
INTERMARINE INCORPORATED,

          Defendants-Appellants-Cross-Appellees-
          Appellees,

_____
_____

_____

NO. 98-40104
_____

SABAH SHIPYARD SDN BHD,

          Plaintiff-
Appellant,

versus

M/V HARBEL TAPPER, L & C III LTD; INDUSTRIAL
MARITIME (BAHAMAS), INC; ROHDE & LIESENFELD
INC;
WINDROSE LINE; INTERMARINE INCORPORATED,

Defendants-Appellees.

Appeals from the United States District Court
for the Southern District of Texas

June 29, 1999

Before REAVLEY, JOLLY, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Defendants Industrial Maritime Carriers (Bahamas), Inc. ("IMB"), Intermarine Incorporated ("Intermarine"), and L & C III Ltd. ("L&C"), appeal the district court's judgment. Plaintiff Sabah Shipyard Sdn. Bhd. ("Sabah") cross-appeals. We reverse and remand for further proceedings.

I

Sabah contracted to sell an electrical power generator to the National Power Company of the Philippines (NAPOCOR). Sabah purchased generating equipment, including a gas turbine engine, in the United States. IMB successfully bid for the business of transporting the equipment from Houston, Texas to Sabah's facilities in Labuan, Malaysia. Accordingly, two booking notes were issued. Each provided for shipment of Sabah's equipment from Houston to Labuan via Singapore. IMB, through its agent Intermarine, issued a bill of lading to Sabah's agent (Rohde & Liesenfeld). The bill of lading provided for shipment aboard the M/V Harbel Tapper ("Harbel Tapper"), which L&C owned. The bill listed Houston as the "port of loading," Singapore as the "port of discharge," and Labuan as the "place of delivery by on-carrier."

When the Harbel Tapper arrived in Singapore, the cargo was temporarily discharged to a barge called the Asia Mariner 5. Later, the barge took on water and developed a list, causing

several packages—including the turbine—to slide off the barge and into the harbor. After the accident, the turbine was recovered, but it could no longer be used for Sabah's project with NAPOCOR.

II

Sabah filed an action in admiralty against IMB, Intermarine, and L&C (collectively, "the defendants"), arising under general maritime law and the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. app. §§ 1300-1315. The defendants answered that, among other things, COGSA limited their liability to $500 per package or per unit. *See* 46 U.S.C. app. § 1304(5). After a bench trial, the district court issued findings of fact and conclusions of law.

The district court found IMB and Intermarine liable for negligence as forwarders, because they (1) took no measures to determine if the Asia Mariner 5 was seaworthy, and (2) stowed the cargo on a barge that was obviously unseaworthy, too small for the cargo, and unlicensed. *See Sabah Shipyard Sdn. Bhd. v. M/V Harbel Tapper*, 984 F. Supp. 569, 574 (S.D. Tex. 1997). In the alternative, the district court found IMB and Intermarine liable as carriers under the Harter Act, 46 U.S.C. app. §§ 190-196, because they (1) negligently discharged the cargo to an unseaworthy and unsuitable barge, and (2) failed to exercise due diligence to provide a seaworthy barge. *See Sabah*, 984 F. Supp. at 574-75. The district court also held L&C liable as a carrier under the Harter Act, because it discharged the cargo to an unseaworthy and unsuitable barge. *See id.* at 575.

The district court declined to apply COGSA's $500-per-package-

-3-

or-per-unit limit on liability. As to IMB's and Intermarine's liability as forwarders, the court held that COGSA's $500 limit did not apply to forwarders. *See id.* at 574. Regarding the defendants' liability under the Harter Act, the district court held that the Harter Act did not provide any limits on liability and that carriers may not limit their liability under the Harter Act. *See id.* at 575. Finally, the district court held that, even if COGSA applied, a carrier may not invoke COGSA's $500 liability limit if it fails to exercise due diligence to provide a seaworthy vessel. *See id.*

The district court found actual damages totaling over $13 million. *See id.* at 573. However, the court ruled that proper treatment of the salvaged turbine parts would have substantially mitigated Sabah's loss, and it reduced the amount of damages accordingly. *See id.* The district court also rejected Sabah's argument that Sabah was entitled to additional damages stemming from a liquidated-damages clause in its contract with NAPOCOR. *See id.* at 574.

Based on these findings and conclusions, the district court entered judgment against IMB, Intermarine, and L&C in the amount of $9,125,565.78. *See id.* at 575. The defendants timely appealed, and Sabah timely cross-appealed.

### III

The defendants argue that the district court erred by denying them the $500-per-package-or-per-unit limit on liability afforded

to carriers under COGSA.[1]  COGSA provides that a carrier shall not

be liable,

> "for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package . . . , or in the case of goods not shipped in packages, per customary freight unit . . . , unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading."

46 U.S.C. app. § 1304(5).  To take advantage of COGSA's limit on

liability, however, the carrier must offer the shipper a "fair

opportunity" to declare the true value of the shipment and to pay

a correspondingly higher shipping rate.  *See Brown & Root v. M/V*

*Peisander*, 648 F.2d 415, 424 (5th Cir. 1981); *Tessler Bros. (B.C.)*

*Ltd. v. Italpacific Line*, 494 F.2d 438, 443 (9th Cir. 1974); 2A

BENEDICT ON ADMIRALTY § 166 at 16-24 to 16-25 (April 1999) ("BENEDICT").

Thus, under COGSA, the $500 liability limit applies unless (1) the

shipper declares a higher value and pays a higher shipping rate, or

(2) the carrier does not give the shipper a fair opportunity to

declare a higher value.  *See Wuerttembergische & Badische*

*Versicherungs-Aktiengesellschaft v. M/V Stuttgart Express*, 711 F.2d

621, 622 (5th Cir. 1983).  It is undisputed that neither Sabah nor

its agent declared a higher value for the cargo.  Sabah does not

contend that the defendants denied it a fair opportunity to declare

a higher value.

On appeal, the defendants challenge each of the district

court's reasons for not applying COGSA's liability limit.  First,

---

[1] In its brief, L&C also argues that it could not be held liable under either COGSA or the Harter Act because it was not a carrier.  At oral argument, however, L&C withdrew this argument, stating that it does not contest its carrier liability.

IMB and Intermarine argue that the district court erred in holding them liable as forwarders, which are not covered by COGSA. Second, the defendants argue that the Harter Act does not prevent application of the $500 liability limit in this case. Third, the defendants argue that COGSA's $500 limit applies even to carriers who fail to exercise due diligence to provide a seaworthy vessel.

In admiralty cases tried by the district court without a jury, we review the district court's legal conclusions *de novo*. *See Nerco Oil & Gas, Inc. v. Otto Candies, Inc.*, 74 F.3d 667, 668 (5th Cir. 1996). We review the district court's factual findings under the clearly erroneous standard. *See* FED. R. CIV. P. 52(a); *Nerco*, 74 F.3d at 668. The clearly erroneous standard of review does not apply "to decisions made by district court judges when they apply legal principles to essentially undisputed facts." *Walker v. Braus*, 995 F.2d 77, 80 (5th Cir. 1993).

A

We first address whether the district court erred by holding IMB and Intermarine liable as forwarding agents. They contend that under COGSA, they are carriers, and not forwarding agents. Whether IMB and Intermarine are carriers or forwarders is crucial, because COGSA's liability limit applies only to "carriers." 46 U.S.C. app. § 1304(5); *see also Zajicek v. United Fruit Co.*, 459 F.2d 395, 402 (5th Cir. 1972) (holding that the $500 limit does not apply to forwarders).

Under COGSA, "[t]he term 'carrier' includes the owner or the charterer who enters into a contract of carriage with a shipper."

-6-

46 U.S.C. app. § 1301(a). A "contract of carriage" is one that is "covered by a bill of lading or any similar document of title, insofar as such document relates to the carriage of goods by sea . . . ." 46 U.S.C. app. § 1301(b). To determine whether a party is a COGSA carrier, we have followed COGSA's plain language, focusing on whether the party entered into a contract of carriage with a shipper. For example, in *Pacific Employers Ins. Co. v. M/V Gloria*, 767 F.2d 229 (5th Cir. 1985), we reasoned that a party is considered a carrier under COGSA if that party "executed a contract of carriage." *Id.* at 234; *see also Bunge Edible Oil Corp. v. M/VS' Torm Rask & Fort Steele*, 949 F.2d 786, 788-89 (5th Cir. 1992) (finding that no factual issues existed as to carrier status where party demonstrated that it entered into a contract of carriage with a shipper); *Nitram, Inc. v. Cretan Life*, 599 F.2d 1359, 1370 (5th Cir. 1979) (finding that a party was a carrier under COGSA simply because it entered into a contract of carriage with a shipper); *Demsey & Assocs. v. S.S. Sea Star*, 461 F.2d 1009, 1014 (2d Cir. 1972) ; *Trade Arbed, Inc. v. S/S Ellispontos*, 482 F. Supp. 991, 994 (S.D. Tex. 1980) ("One principle emerges clearly: whoever enters the contract of carriage with the shipper in a given transaction comes within the definition of a "carrier" pursuant to Section 1301(a) of COGSA.").

In this case, it is without question that IMB and Intermarine entered into a contract of carriage with Sabah. They agreed to carry Sabah's goods by sea, and they issued a bill of lading. Hence, under the plain language of COGSA and our precedent, IMB and

Intermarine are carriers.[2]. As to the second *Zima* factor, there is no evidence of any history of dealings between the parties.[3] However, Sabah contends that IMB and Intermarine are estopped from claiming that they are not forwarders.[4] Sabah relies on (1) a letter from IMB to Sabah, in which IMB stated that it was acting solely as a forwarding agent after the cargo was discharged from the Harbel Tapper, and (2) Clause 6 of the bill of lading, which provides: "When the ultimate destination at which the Carrier may have engaged to deliver the goods is other than the vessel's port of discharge, the Carrier acts as Forwarding Agent only."[5]

Sabah fails to cite any authority that these documents provide a basis for estoppel. Indeed, Sabah fails even to explain what form of estoppel should apply. Neither collateral estoppel, judicial estoppel, nor equitable estoppel apply to the case at hand. Collateral estoppel prevents a party from contesting certain issues that were "previously decided in another proceeding." *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 832 (5th Cir. 1998). Whether IMB and

---

[2] IMB and Intermarine further contend that they are carriers under the test set forth in *Zima Corp. v. M. V. Roman Pazinski*, 493 F. Supp. 268 (S.D.N.Y. 1980). *Zima* advises us to consider four factors in assessing whether a party is a carrier under COGSA: (1) how the party's obligation is expressed in the documents pertaining to the agreement, (2) the history of dealings between the parties, (3) whether the party issued a bill of lading, and (4) how the party charged the shipper. *See id.* at 273.

Our court has yet to apply anything resembling the *Zima* test, opting instead to follow the plain language of COGSA. *See, e.g.*, *Pacific Employers*, 767 F.2d at 234. We note, however, that applying the factors articulated in *Zima* would only bolster our conclusion that IMB and its agent Intermarine were carriers under COGSA. IMB is listed as the "carrier" on the bill of lading and the booking notes.

```
IMB issued the bill of lading.  IMB charged Sabah a fixed amount
for carrying its cargo, which is typical for a carrier; it did not
bill Sabah for the actual cost of shipment plus a fee for its own
services, which is typical for a forwarder.  See Zima, 493 F. Supp.
at 273.
```

[4] The district court made no finding as to whether IMB and Intermarine are estopped from contesting that they acted as forwarders.

[5] A literal application of Clause 6 seems to make IMB and Intermarine forwarding agents under these circumstances. The cargo's ultimate destination (Labuan) was "other than" the Harbel Tapper's port of discharge (Singapore). Even so, Sabah fails to explain how such a provision could override Congress' intent to have COGSA apply to all parties who "enter into a contract of carriage with a shipper." 46 U.S.C. app. § 1301(a). The fact remains that IMB and Intermarine entered into such an agreement with Sabah, and whether Clause 6 purports to make IMB and Intermarine forwarders under certain circumstances does not alter that fact. In general, contractual terms alone cannot grant parties a certain legal status contrary to governing federal law. *See Morey v. Western Am. Specialized Transp. Servs., Inc.*, 968 F.2d 494, 498 n.5 (5th Cir. 1992) (holding that the contractual designation of truckers as "independent contractor[s]" is "not determinative" in light of federal regulations to the contrary).

Intermarine acted as forwarders was never the subject of any previous proceeding. Judicial estoppel prevents a party from taking a position "that is contrary to a position previously taken in the same or some earlier proceeding." *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996). Neither the letter nor the bill of lading constitute a position taken in the present or any previous proceeding. A party may only invoke equitable estoppel if it detrimentally relied on the misrepresentations of the other party. *See Neiman-Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 371 n.4 (5th Cir. 1990) (Texas law equitable estoppel); *Oxford Shipping Co. v. New Hampshire Trading Corp.*, 697 F.2d 1, 4 (1st Cir. 1982) (equitable estoppel in the context of COGSA). Sabah does not argue that it relied on any representations that IMB and Intermarine acted as forwarders.

IMB and Intermarine are carriers as the term is defined in COGSA, and we reject Sabah's contention that IMB and Intermarine are estopped from disclaiming forwarder status. Accordingly, we find that the district court erred in refusing to apply COGSA's $500 liability limit on the ground that IMB and Intermarine acted as forwarders.

B

The defendants also argue that the district court erred in finding that the Harter Act prevented them from invoking COGSA's $500 liability limitation. The Harter Act of 1893 was Congress' first attempt to set forth the obligations of maritime carriers. *See* 2A BENEDICT § 11 at 2-3. The Harter Act defines a carrier's duties with regard to proper loading, stowage, custody, care, and delivery of cargo. *See Metropolitan Wholesale Supply, Inc. v. M/V Royal Rainbow*, 12 F.3d 58, 61 (5th Cir. 1994). In 1936, Congress enacted COGSA, which supersedes much of the Harter Act. *See Tapco Nigeria, Ltd. v. M/V Westwind*, 702 F.2d 1252, 1255 (5th Cir. 1983). However, COGSA expressly provides that it does not supersede the Harter Act as to "the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship." 46 U.S.C. app. § 1311. Hence, "COGSA . . . does not apply either before loading or after discharge of the cargo." *Allied Chem. Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 483 (2d Cir. 1985) (citing 46 U.S.C. app. § 1311). During those periods, the Harter Act governs. *See Wemhoener Pressen v. Ceres Marine Terminals, Inc.*, 5 F.3d 734, 739 (4th Cir. 1993); *Tapco Nigeria*, 702 F.2d at 1255.

Sabah argues that, because its cargo was damaged after discharge from the Harbel Tapper, the Harter Act governs. Thus, according to Sabah, COGSA's $500 liability limit does not apply. The defendants respond that the bill of lading contractually extended COGSA's $500 limit to the period after discharge.[6] The bill of lading provides

_____

[6] The defendants also contend that the incident did not truly arise "after discharge" and outside the statutory purview of COGSA. They contend that this case is covered by COGSA because Sabah's claim stems from the defendants' breach of their COGSA duty to properly discharge the cargo. *See* 46 U.S.C. app. § 1303(2) ("The carrier shall properly and carefully . . . discharge the goods carried."). However, we need not reach this argument in order to dispose of the issue before

– 9 –

that COGSA shall govern before loading, after discharge, and during the entire time when the cargo is in the carrier's possession.

Sabah does not contest that the bill of lading purports to extend COGSA to the period after discharge. Rather, it asserts that the Harter Act prohibits a carrier from contractually extending COGSA's liability limit to the periods covered by the Harter Act. As support, Sabah cites §§ 1 and 2 of the Harter Act. Section 1 of the Harter Act provides that a carrier may not insert any contractual provision under which the carrier is "relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of [its cargo]." 46 U.S.C. app. § 190. Section 2 of the Harter Act commands that a carrier may not insert any contractual provision that "lessen[s], weaken[s], or avoid[s]" its duty to exercise due diligence to provide a seaworthy vessel or its duty to handle, stow, and deliver its cargo. 46 U.S.C. app. § 191. Sabah contends that to allow the defendants to contractually extend the COGSA's $500 liability limit would run afoul of these Harter Act provisions.

Numerous courts, including our own, have stated that parties may contractually incorporate COGSA's provisions to the periods of a voyage ordinarily covered by the Harter Act. *See Mori Seiki USA, Inc. v. M.V. Alligator Triumph*, 990 F.2d 444, 447 (9th Cir. 1993); *Insurance Co. of N. Am. v. Puerto Rico Marine Management, Inc.*, 768 F.2d 470, 475 (1st Cir. 1985); *Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d 313, 315 (2d Cir. 1983); *Baker Oil Tools, Inc. v. Delta S.S. Lines, Inc.*, 562 F.2d 938, 940 n.3 (5th Cir. 1977).[7] None of these cases, however, expressly discusses whether the Harter Act impacts the parties' ability to extend COGSA to the periods before loading and after discharge.[8] One case in our circuit, however, has examined this issue. *See Uncle Ben's Int'l Div. of Uncle Ben's, Inc. v. Hapag-Lloyd Aktiengesellschaft*, 855 F.2d 215, 217 (5th Cir. 1988). There, we ruled that where the parties contractually extend the provisions of COGSA to the periods covered by the Harter Act, "any inconsistency with the Harter Act must yield to the Harter Act." *Id.*[9]

---

us.

[7] Some of these cases specifically address the contractual incorporation of COGSA's $500 liability limit. *See Mori Seiki*, 990 F.2d at 447-48; *Baker Oil Tools*, 562 F.2d at 940 n.3.

[8] Our opinion in *Baker Oil Tools*, although it does not specifically address §§ 1 and 2 of the Harter Act, suggests that the Harter Act itself allows the contractual incorporation of COGSA. We wrote: "*[B]y virtue of the Harter Act*, which governs the pre-loading phase of the carrier's responsibility to the shipper, the parties may agree to extend COGSA's package limitation provision to cover the time when the goods are in the carrier's possession prior to loading." *Baker Oil Tools*, 562 F.2d at 940 n.3 (emphasis added) (citations omitted).

[9] Applying this test, we concluded that the contractual incorporation of COGSA's one-year statute of limitation was not inconsistent with the Harter Act. *See Uncle Ben's*, 855 F.2d at 217.

Under our precedent, then, the key issue is whether the contractual incorporation of COGSA's $500-per-package-or-per-unit limit on liability is inconsistent with the Harter Act. We have not found, nor has Sabah cited, any case holding that COGSA's $500 limit is inconsistent with the Harter Act. To the contrary, several courts have upheld the contractual extension of COGSA's $500 limit to the periods covered by the Harter Act, despite challenges that such limits were invalid. For example, the court in *Commonwealth Petrochemicals, Inc. v. S/S Puerto Rico*, 607 F.2d 322 (4th Cir. 1979), enforced a contractual provision that extended COGSA's $500 limit, finding that such a provision "is clearly valid under the Harter Act." *Id.* at 328. Likewise, in *Seguros "Illimani" S.A. v. M/V Popi P*, 929 F.2d 89, 93-94 (2d Cir. 1991), the court rejected a shipper's argument that a contractual provision, which made COGSA applicable both to the post-discharge period and to parties other than the carrier, violated public policy. The court held: "Admiralty law, which limits liability to $500 per package by statute, certainly permits the contractual extension of COGSA's limitation of liability to cover . . . the post-discharge period." *Id.* at 94.[10]

Cases that address the validity of contractual limits on carrier liability in general are also instructive as to whether such limits are "inconsistent" with the Harter Act. Numerous cases have allowed carriers to contractually limit their liability, provided the shipper has the option to declare a higher value and to pay a correspondingly higher shipping rate. For example, the court in *Antilles Insurance Co. v. Transconex, Inc.*, 862 F.2d 391 (1st Cir. 1988), found that the Harter Act did not invalidate a contractual provision that limited the carrier's liability to $50 per shipment. *See id.* at 393. Indeed, such provisions were regularly upheld during the years before COGSA's enactment, when the Harter Act was the only federal legislation addressing a carrier's duties. During that period, courts enforced bills of lading that set an agreed valuation for the cargo, above which the carrier would not be held liable unless the shipper declared a higher value in advance. *See Frederick Leyland & Co. v. Hornblower*, 256 F. 289, 291-92 (1st Cir. 1919); *Hohl v. Norddeutscher Lloyd*, 175 F. 544, 547 (2d Cir. 1910); *see also* 2A BENEDICT § 12 at 2-5. The Supreme Court wrote:

> Agreements of this kind are held to be reasonable and not offensive to the public policy against contracts relieving the carrier from its own negligence. The agreement as to value in consideration of carriage at the lower rate thus obtained is held to estop the shipper from demanding damages in excess of the agreed value.

*Ansaldo San Giorgio I v. Rheinstrom Bros. Co.*, 294 U.S. 494, 497, 55 S. Ct. 483, 484-85, 79 L. Ed. 1016 (1935)

---

[10] Another Second Circuit case, which examined whether a bill of lading provision was valid under the Harter Act, stated: "If [the carrier] had said simply that liability before loading or after discharge would be limited to $500 per container unless a higher valuation were declared and a higher rate paid, such a stipulation would have effectively limited its liability for the loss that here occurred." *Leather's Best, Inc. v. S.S. Mormaclynx*, 451 F.2d 800, 816 (2d Cir. 1971).

(citations omitted).[11]

Thus we find ample support for the proposition that parties may contractually incorporate COGSA's $500 liability limit to the periods of carriage before loading and after discharge. The cases cited by Sabah to the contrary fail to persuade us. In both *Caterpillar Overseas, S.A. v. S.S. Expeditor*, 318 F.2d 720 (2d Cir. 1963), and *United States v. Ultramar Shipping Co.*, 685 F. Supp. 887 (S.D.N.Y. 1987), *aff'd* 854 F.2d 1315 (2d Cir. 1988), the Second Circuit invalidated contractual provisions that would have completely exonerated the carrier from any liability. *See Caterpillar,* 318 F.2d at 723-24; *Ultramar*, 685 F. Supp. at 896. In the case at hand, however, the defendants invoke a contractual provision that would merely limit the amount of the carrier's liability. "This distinction between a limitation on liability and an exemption from liability is crucial. A limitation, unlike an exemption, does not induce negligence." *Tessler Bros. (B.C.) Ltd. v. Italpacific Line*, 494 F.2d 438, 443 (9th Cir. 1974).

Sabah also cites *Philip Morris v. American Shipping Co.*, 748 F.2d 563 (11th Cir. 1984), as support for the proposition that a carrier may not contractually extend COGSA's $500 liability limit to the period of the voyage covered by the Harter Act. In that case, the Eleventh Circuit declined to apply COGSA's $500 limitation, even though the parties agreed to extend COGSA's provisions to the portion of the voyage before loading and after discharge. The plaintiff in *Philip Morris* alleged that the carrier failed to deliver its cargo to a fit wharf. The Eleventh Circuit ruled: "Because the cargo was not properly delivered to a fit wharf, the Harter Act, not the limitation provisions contained in the bills of lading, controls the question of liability." *Id.* at 567. In so holding, the court did not explain precisely what provisions of the Harter Act took precedence over the limitation provisions in the bill of lading. Nor did the court examine whether COGSA's liability limit was inconsistent with the Harter Act, as we must under the law of our circuit. *See Uncle Ben's*, 855 F.2d at 217.

It would be wrong to read *Philip Morris* as flatly prohibiting parties from contractually extending COGSA's $500 liability limit to the period covered by the Harter Act. Such a reading not only would be out of step with the precedent we have detailed above, but would be inconsistent with the rest of the Eleventh Circuit's opinion in *Philip Morris*. Although the *Philip Morris* court acknowledged that "the Harter Act applies to those extended periods of time before and after the loading of the cargo on and off the vessel," *id.* at 566, it then reaffirmed the well-settled principle that "parties may agree to extend the COGSA limitation provisions to cover the entire period of time in which the carrier has custody of the cargo." *Id.* This language bolsters the proposition that a carrier may contractually extend

---

[11] Admittedly, this statement is *dicta*, because the Supreme Court found that the provision at issue in *Ansaldo* did not merely limit the carrier's liability to an agreed valuation, but rather completely exonerated the carrier with respect to certain types of cargo. *See Ansaldo*, 294 U.S. at 499, 55 S. Ct. at 485.

the provisions of COGSA to the period covered by the Harter Act.[12]

Accordingly, we hold that the contractual incorporation of COGSA's $500 per-package-or-per-unit limit on liability is not inconsistent with the Harter Act, and is enforceable. The district court erred in holding that the Harter Act prevented the defendants from invoking COGSA's limitation on liability.

C

Finally, the defendants argue that the district court erred in holding that a carrier may never invoke COGSA's $500 limit where, as here, it fails to exercise due diligence to make the vessel seaworthy. In response, Sabah again cites *Philip Morris*. In that case, the Eleventh Circuit wrote: "To permit [the carrier] the benefit of the $500 limitation, despite the finding of the district court that [the carrier] failed to exercise due diligence in preventing damage to the cargo, . . . would immunize the carrier from the adverse consequences of the negligent handling of cargo." *Id.* at 567.

Nothing in the text of COGSA suggests that the $500 limit on liability is available only to carriers who exercise due diligence to insure a seaworthy vessel. To the contrary, COGSA provides: "Neither the carrier nor the ship shall *in any event* be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package . . . or . . . per customary freight unit . . . ." 46 U.S.C. app. § 1304(5) (emphasis added). Furthermore, to hold that a carrier is never entitled to the $500 limitation on liability if it fails to exercise due diligence would render the $500 limitation a nullity. Under COGSA, a carrier may not be held liable in the first place *unless* it fails to exercise due diligence to make the ship seaworthy. *See* 46 U.S.C. app. § 1304(1) ("Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy . . . ."). Indeed, other circuits have applied the $500 limit even where the carrier failed to exercise due diligence. *See, e.g.*, *Iligan Integrated Steel Mills, Inc. v. SS John Weyerhauser*, 507 F.2d 68, 70, 73 (2d Cir. 1974).

Accordingly, we find that the district court erred in holding that a carrier is barred from invoking COGSA's $500 liability limitation whenever it fails to exercise due diligence to provide a seaworthy vessel.

IV

For these reasons, we conclude that the district court erred in refusing to calculate damages pursuant to COGSA's $500-per-package-or-per-unit limit on liability. *See* 46 U.S.C. app. § 1304(5). We decline to address the issues raised in Sabah's cross-appeal regarding the mitigation and foreseeability of certain damages. The record does not suggest that we must resolve these issues in order for the district court to calculate damages under COGSA's $500

---

[12] It is unclear how this language can be reconciled with the *Philip Morris* court's conclusion that the carrier was not entitled to COGSA's $500 limit on liability. We are not bound by the precedent in the Eleventh Circuit, however, and hence we need not resolve this apparent inconsistency.

-13-

liability limitation.[13]  Accordingly, we REVERSE and REMAND for proceedings not inconsistent with this opinion.

---

[13] We also decline the defendants' invitation to calculate, on appeal, the precise amount of damages due under 46 U.S.C. § 1304(5).  Such a determination may require further findings of fact, which an appellate court cannot make.