**COMMERCIAL METALS CO., Plaintiff,**

v.

**M/V LINDOS, its appurtenances, In Rem, et al., Defendants.**

**No. Civ.A. H–03–2848.**

United States District Court, S.D. Texas, Houston Division.

Feb. 23, 2005.

**572**

Ernest M. Powell, III, Kratochvil & Powell, Houston, TX, for Plaintiff.

Steven L. Roberts, Fulbright & Jaworksi, Houston, TX, Jeffrey R. Bale, Bale Stinneford et al, Sugar Land, TX, for Defendants.

## MEMORANDUM AND OPINION

ROSENTHAL, District Judge.

This is an admiralty action involving a steel shipment that allegedly arrived at the Port of Houston in a damaged condition. Commercial Metals Co., the cargo owner, sued the M/V LINDOS *in rem*, Atlantic Maritime Carrier, Grenshaw Holdings, Inc., and Gulf Stream Marine, Inc., seeking $11,237.68 in damages and at least $5,000 in attorneys' fees. Despite the lengthy list of named defendants, only two have been served and answered: Atlantic Maritime Services, Inc. and the stevedore, Gulf Stream Marine, Inc. (Docket Entry Nos. 4, 15).

Gulf Stream moved for partial summary judgment on the ground that the marine survey report showed that the damage in the case was almost entirely caused by improper loading and stowage of the cargo, resulting in rust, dents, and bends. (Docket Entry No. 11). Commercial Metals responded and cross-moved for summary judgment, asserting that the same survey report shows that there were "some bent pieces" that may have been damaged in the discharge operation. (Docket Entry No. 12). Gulf Stream Marine responded. (Docket Entry No. 13). Based on the complaint, the motions, responses, summary judgment evidence, and the applicable law, this court denies Commercial Metals's motion for summary judgment and grants Gulf Stream's motion for summary judgment, dismissing the claims against Gulf Stream with prejudice. The reasons are stated below.

## I. Background

In June 2003, Commercial Metals, as "shipper, consignee or owner," shipped over six thousand metric tons of steel tubing, purlins,[1] angles, wire coils, and plate from Eregli, Turkey to Houston, Texas. Grenshaw Holdings issued eight bills of lading covering the cargo. (Docket Entry No. 1, (Pl.'s Compl.), ¶ 4). Commercial Metals alleges that although the carrier received the shipment in good order and condition in Turkey, the steel arrived damaged at the Port of Houston.

According to the bills of lading that are part of the summary judgment record, Commercial Metals contracted with the carrier to ship the steel from Nemrut Bay, Turkey to the Port of Houston. Only some of the bills of lading are part of the record. One bill of lading showed 479 bundles of steel and another listed 2,725 bundles, covering approximately four thousand tons of the six-thousand ton shipment. The shipment included cold-formed purlins and both painted and unpainted square and rectangular tubing. (Docket Entry No. 12, Exh. A). The tubing came in sizes ranging from one-half inch by one-half inch to six by six inches, and was between twenty and forty feet in length. A bundle could consist of from twelve to over one hundred and eighty individual steel pieces banded together.

Defendant Gulf Stream served as stevedore and unloaded the cargo after the M/V LINDOS arrived in Houston. (Docket Entry No. 2, Exh. B, p. 2). Commercial Metals engaged Zemanek Marine Services, Inc. to perform a discharge survey. Zemanek surveyed the shipment beginning July 26, 2002, examining the cargo "while in stow and during the course of discharge

operations." (Docket Entry No. 12, Exh. B).

The Zemanek report noted that according to the bills of lading, the M/V LINDOS left Turkey with the cargo in good condition. *See, e.g., Steel Coils, Inc. v. M/V LAKE MARION*, 331 F.3d 422, 426 (5th Cir.2003), quoting *Tubacex, Inc. v. M/V RISAN*, 45 F.3d 951, 954 (5th Cir.1995). The M/V LINDOS carried the steel in hatches one, three, and five. According to the Zemanek survey:

> Upon opening hatches 1, 3 and 5, the bundles of black & painted tubing and purlins were similarly stowed.... No shifting was evident as they were secured with wire lashings and turnbuckles. Dunnage[2] was placed between tiers; however, not in a vertical fashion.... As a result, several bundles had pieces dented in way of improperly placed dunnage boards. Individual pieces within scattered bundles were bent. Several bundles were with broken securing bands. These conditions were indicative of rough, careless and/or improper handling during loading operations as well as faulty stowage aboard the ocean carrier.

(*Id.*). The report also explained that the bending damage resulted from the improper use of dunnage boards:

> As previously mentioned, dunnage was placed between tiers in stow; however it was inadequate in the opinion of the undersigned surveyor. Although there were some 4″ × 4″ timbers used, there were a considerable number of 1″ by 4″ dunnage strips. Stevedore had difficulty readying bundles for discharge In several instances, stevedore had difficul-

---

1. A purlin is a C- or Z-shaped sheet metal piece that provides horizontal support, often used between primary framing and supporting roof materials.

2. Dunnage is material, often wood, which is not fastened firmly to the means of transport, and used to protect the goods from stress or as a stowage aid.

ty placing the wire slings beneath the bundles in order to ready them for discharge due to the limited space between tiers.

(*Id.*). The Zemanek survey concluded that improper handling during loading and faulty stowage during the voyage resulted in bending and dent damage to many of the tubing and purlin bundles. (*Id.*).

The steel shipment apparently suffered rust damage as well. According to the Zemanek report,

> An obvious pattern of rust was noted in hatch 1 aft end, starboard side. . . . After close examination, it was the opinion of the undersigned surveyor that the seepage in this compartment resulted from the lack of proper maintenance of hatch cover securing devices that were in need of repair. The chief officer was questioned in regards to any structural damages on the weather deck which may have occurred during the ocean transit. None was noted or demonstrated. There was evidence of ship's sweat in hatches 3 and 5. Several top stowed bundles were rusted to various degrees in both compartments.

(*Id.*).

As for the remaining steel in the shipment, the Zemanek report stated that were coils were undamaged. The survey did not indicate whether the bundled steel angles were damaged, noting only that "[n]o shifting was evident as they were secured with wire lashings and turnbuckles. Dunnage boards were placed between tiers." (*Id.*). Bundles of floor plate sheets "were bottom stowed in hatch 3, forward end. . . . No shifting was evident. Several bundles were found with minor edge crimps." (*Id.*).

The Zemanek survey had only one comment on discharge operations. "During the course of discharge operations, one of the wire slings parted. As a result, the four bundles in the draft were dropped becoming loose and adrift. As can be seen from the attached photographs, there were some bent pieces. Stevedore was instructed to recooper these bundles and set aside all damaged pieces." [3] (*Id.*). There were no photographs submitted as part of the summary judgment evidence.

## II. Analysis

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Norman v. Apache Corp.,* 19 F.3d 1017, 1023 (5th Cir.1994). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *See Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.1995). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See Little,* 37 F.3d at 1075 (citing *Celotex,* 477

---

**3.** The Zemanek report's narrative form does not clearly state whether these damaged articles include only bundled angles, or other bundled steel items as well.

U.S. at 325, 106 S.Ct. 2548). "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little,* 37 F.3d at 1075 (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548).

Defendant Gulf Stream has moved for partial summary judgment on the basis that the pleadings and record do not create a fact issue as to either liability or damages. As to liability, Gulf Stream argues that there is no evidence that the stevedore caused damage to any pieces that were not also damaged during the voyage. As to damages, Gulf Stream argues that the Commercial Metals has not presented any evidence as to the damages attributable to the discharge of the cargo, as opposed to the loading and stowage. "Plaintiff does not allege any facts that specify what Gulf Stream Marine did or failed to do that in any way resulted in the alleged damage." (Docket Entry No. 11, p. 2). Commercial Metals has cross-moved for summary judgment, stating that it presented a *prima facie* case through the bill of lading and that Gulf Stream has failed to meet its burden of showing that the damage occurred due to an excepted cause under COGSA, 46 U.S.C.App. 1300 *et. seq.* (2005). (Docket Entry No. 12). Commercial Metals alternatively argues that its summary judgment evidence "presents, at a minimum a material fact issue." (Docket Entry No. 12, ¶ 4). Gulf Stream responds that Commercial Metals is incorrectly imposing a carrier's burden of proof on the stevedore.

■ COGSA sets out the burden of proof in a maritime cargo claim. "In a maritime cargo claim, the initial burden is on [the shipper] to prove good order-bad

order—that he delivered the goods to the carrier in apparent good order and condition and that, upon return, they were damaged." *Westinghouse Elec. Corp. v. M/V LESLIE LYKES,* 734 F.2d 199, 206 (5th Cir.1984) (citing 46 U.S.C.App. § 1303(4); *Blasser Bros., Inc. v. N. Pan-American Line,* 628 F.2d 376, 381 (5th Cir.1980); *Terman Foods, Inc. v. Omega Lines,* 707 F.2d 1225, 1227 (11th Cir.1983)) (internal quotation omitted). A clean bill of lading is *prima facie* evidence meeting the shipper's initial burden. *See Pac. Employers Ins. Co. v. M/V GLORIA,* 767 F.2d 229, 239 (5th Cir.1985). Once the shipper has met its initial burden, "the burden shifts to the Carrier to prove that the harm was caused by one of the statutorily excepted causes." *M/V LESLIE LYKES,* 734 F.2d at 206 (citing 46 U.S.C. §§ 1302, 4(2); 46 U.S.C. 182; *Blasser Bros.,* 628 F.2d at 381).

■ "Plaintiffs may recover under COGSA only from the 'carriers' of the cargo." *M/V Gloria,* 767 F.2d at 234. Under COGSA, "the term 'carrier' includes the owner or the charterer who enters into a contract of carriage with a shipper." 46 U.S.C. § 1301(a); *Sabah Shipyard Sdn. Bhd. v. M/V HARBEL TAPPER,* 178 F.3d 400, 405 (5th Cir.1999). Although "more than one party may be a carrier," *Hale Container Line, Inc. v. Houston Sea Packing Co., Inc.,* 137 F.3d 1455, 1464 (11th Cir.1998), it is undisputed that Gulf Stream served only as the shipment's stevedore at the point of discharge. (Docket Entry No. 12, Exh. 43, p. 2). COGSA does not apply to stevedores as agents of carriers. *See, e.g., Steel Coils,* 331 F.3d at 437. A COGSA carrier does, however, have statutory obligations that "extend[] through discharge." *United States v. Ocean Bulk Ships, Inc.,* 248 F.3d 331, 342 (5th Cir.2001). The Supreme Court addressed whether COGSA's $500-per-pack-

age limitation applied to the negligent stevedore agents of a carrier in *Robert C. Herd & Co. v. Krawill Machinery Corp.,* 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959). The Court concluded

> The Act is clearly phrased. It defines the term "carrier" to include "the owner or the charterer who enters into a contract of carriage with the shipper." It imposes particularized duties and obligations upon, and grants stated immunities to, the "carrier." Respecting limitation of the amount of liability for loss of or damage to goods, it says that "neither the carrier nor the ship" shall be liable for more than $500 per package. It makes no reference whatever to stevedores or agents.

*Id.* at 301, 79 S.Ct. 766. Commercial Metals contracted with other defendants, not Gulf Stream, as the "carriers" to ship its steel. "COGSA only applie[s] to disputes between shippers and carriers." M/V LAKE MARION, 331 F.3d at 437, citing *Citrus Marketing Board of Israel v. J. Lauritzen A/S,* 943 F.2d 220 (2d Cir.1991). The shifting burden of proof under COGSA does not provide a basis for granting summary judgment in favor of Commercial Metals against Gulf Stream.

■ Both parties rely on the Zemanek report as evidence justifying summary judgment in its favor. In addition to the report, Gulf Stream submits as summary judgment evidence Commercial Metals's original complaint, initial disclosures, and responses to Gulf Stream's interrogatories and requests for production. In the substance of its complaint, Commercial Metals alleges that "[t]he damage, delay and shortage to the cargo was the direct and proximate result of the acts or failure to act of one or more of the Defendants herein, which acts or failure to act constituted negligence, breach of contract of carriage, breach of contract of bailment, and/or breach of implied and/or express warranties and/or unseaworthiness on the part of one or more of the Defendants while the cargo was in each such Defendant's care." (Docket Entry No. 1, p. 3). The complaint does not specify which defendant bears responsibility for which elements of damage. Nor does it single out any particular act or omission by the stevedore, Gulf Stream.

The Zemanek report identifies extensive damage from improper loading and stowage, including rusted, bent, and damaged pieces. During discharge, a wire sling parted, causing four bundles of angles to drop. (Docket Entry No. 12, p. 2). The discharge survey report states that "there were some bent pieces." (*Id,* Exh. B, p. 6). As Gulf Stream points out, the Zemanek report does not identify how many pieces were bent or discuss whether these pieces were also damaged during the sea voyage as a result of the improper placement of the dunnage boards noted in the report. Even as to these four bundles, the survey report also notes that the stevedore was using the ship's crane and sling to discharge the cargo and had difficulty in placing its equipment around bundles because of limited space between tier from the inadequate dunnage. "Stevedore had difficulty readying bundles for discharge" due to the use of a "considerable number of 1″ × 4″ dunnage strips," rather than the larger 4″ × 4″ strips. "In several instances, stevedore had difficulty placing the wire slings beneath the bundles in order to ready them for discharge due to the limited space between tiers." (Docket Entry No. 11, Exh. A (Zemanek Report) pp. 4—5).

The record makes it clear that out of approximately 3,200 bundles identified in the submitted bills of lading, only four bundles were identified as having been involved in any problem relating to dis-

charge and only "some" pieces in those four bundles were bent. In its interrogatories and requests for production, Gulf Stream asked Commercial Metals to "[i]dentify specifically the cargo you contend GSM [Gulf Stream Marine] damaged, if any." Commercial Metals responded, "GSM damaged the cargo identified in the discharge and damage surveys previously provided." (Docket Entry No. 11, Exh. A–1, ¶ 9). Gulf Stream also asked Commercial Metals to "[i]dentify all damages to the cargo occurring after discharge." Commercial Metals similarly responded, "Damages to the cargo are identified in the discharge and damage surveys." (*Id.*, ¶ 17).[4] The Zemanek report stated that many pieces in the bundles were rusted, bent, and dented before the stevedore unloaded them. "These conditions were indicative of rough, careless and/or improper handling during loading operations as well as faulty stowage aboard the ocean carrier." Commercial Metals appears to concede that damage occurred before Gulf Stream's discharge operations, stating, "The shipment arrived at the Port of Houston in damaged condition." In response to discovery requests, and in response to the summary judgment motion, Commercial Metals made no attempt to identify how many pieces were involved and what damages resulted.

Commercial Metals has not pointed to or submitted evidence in the summary judgment record that Gulf Stream improperly handled the cargo, that any act or omission of Gulf Stream damaged steel pieces that had not already been damaged in transit, or any damage amount that was attributable to Gulf Stream. The summary judgment evidence that Commercial Metals provides does not create a genuine issue of material fact as to Gulf Stream's liability or as to damages. This court denies Commercial Metal's motion for summary judgment and grants summary judgment in favor of Gulf Stream.

## IV. Conclusion

Gulf Stream's motion for summary judgment is granted. Commercial Metals's motion for summary judgment is denied and Commercial Metals's claims against Gulf Stream are dismissed, with prejudice.

---

4. By its general responses to Gulf Stream's specific interrogatories, Commercial Metals appears to argue that Gulf Stream is liable for all damaged cargo shipped aboard the M/V LINDOS. Undisputed evidence, including the Zemanek report, establishes that virtually all of the damage to the shipment occurred during loading, stowing, or shipping the steel, and not during discharge operations. The evidence does not permit any determination of what, if any, damage occurred during the discharge.